Defendant-appellant Timothy Courtney was convicted and sentenced for DUI, following a jury trial. He appeals from the overruling of his motion for a new trial. He contends that his conviction is against the manifest weight of the evidence, and that the trial court erred when it failed to sustain an objection to a remark made by the prosecutor during closing argument.
We have reviewed the record, and we conclude that Courtney's conviction is not against the manifest weight of the evidence. We also conclude that the prosecutor's comment, during closing argument, concerning the truthfulness of the arresting officer was fair comment, based upon the context in which the remark was made. Furthermore, we conclude that the issue of prosecutorial misconduct is not properly before us, because it was not the subject of Courtney's motion for a new trial, from the overruling of which this appeal is taken. Accordingly, the judgment of the trial court is Affirmed.
 I
On October 5, 1997, some time between 1:00 and 2:00 in the morning, Sergeant Kenneth R. Bell, of the Ohio State Highway Patrol, stopped a car being driven by Courtney because there was no front license plate. Bell described what happened thereafter as follows:
 Q. What did you do once you stopped the vehicle then?
 A. I stopped the vehicle and I made a left side approach which would be an approach along the driver's side of the vehicle. And walked up along side the vehicle, and as I approached the vehicle and stood in a location where I normally would stand for officer safety purposes, I looked in and I observed an individual. He was alone in the car, sitting behind the steering wheel and by the time I approached him he was sitting there and he had his wallet out in front on him and he was looking down at his wallet, and he was going through his wallet.
Q. Did he acknowledge your presence at any point?
 A. For the longest time he didn't. I stood there and just watched, had a flashlight, looking down into the vehicle. He removed things from his wallet and put things back into his wallet, and in a very deliberate, slow motion.
Q. How long did he do that for, do you know?
 A. It seemed at the time like a very long time. I would guess it was probably somewhere in the area of maybe a minute to a minute and a half.
 Q. How many people have you stopped would you estimate in your 20 plus years experience?
 A. That would be a tough estimation. My gosh, well, thousands.
 Q. Did that length of time for him to locate his driver's license. Did that seem like a long period of time for you?
 A. It was a long period of time to locate driver's license. It was a long period of time especially to not even acknowledge my presence.
Q. That seemed unusual to you?
A. It was unusual. Yes, sir.
Q. Were your suspicions aroused at that point?
 A. Well, they were. That's not a normal thing to stand there for that long period of time and not be acknowledged at all. Most people are little concerned, worried, upset, you know, when we stop them, and personally I like to make contact with them as soon as possible, trying to get them to relax and let them know we're not talking about a felony here, or anything like that. It seemed like an extremely long period of time. It was very unusual.
Q. Okay, what happened at that point then?
 A. Once he finally acknowledged me, he kind of glanced over and looked up at me and I asked him to roll the window down. And he started looking around as if to look for something. I didn't know what he was looking for. I was paying much closer attention, watching his hands, for officer safety purposes. And finally I realized that he was, on the ledge area near the door, where the buttons would be to roll windows down. Apparently this vehicle did have, and I come to find out later that it did have, electric windows, and he was pushing buttons to try to figure out which button was going to get the window down. And was having a great deal of difficulty finding the correct button.
Q. Did he attempt to use any of those buttons?
 A. Well, he did. He was hitting buttons at one point in time. It appeared to me like a window on the passenger side of the car started to roll down and when he realized that wasn't the right one, he went to another one and I think I heard door locks unlocking and locking, but never did that window on the driver's side roll down.
 Q. Okay, the window never came down. How did you initiate contact with him?
 A. Well, he finally and I finally about the same period of time, just opened the door up and I just cracked the door a little bit so I could talk with him and try to stop him from fumbling around with the buttons, and let's get on with business.
 Q. When the door opened, did you observe anything at that point?
 A. Well, he still had the wallet, basically, in his lap and as the door opened, obviously, since heat had come out of the car, and I could smell the odor of an alcoholic beverage.
Q. What happened at that point?
 A. Well, I simply asked him for his driver's license and he did hand it up to me after that period of time of looking for it. And he handed me his driver's license and I simply questioned him as to — well I told him why I stopped him, the front license plate on the vehicle. And asked him, if he knew that his license plate was gone? And if he did, why wasn't it permanently mounted on the front like it was supposed to have been?
Q. Okay, did he respond to your question?
 A. He told me that the front license plate had been knocked off some time ago. I walked around quickly to the front of the vehicle and looked on the front bumper area to see if there was any damage — any indication of it having been knocked off. And there wasn't even an indication as to where the license plate might have been. I didn't see any holes, any brackets, things like that. So I walked back to him, along the driver's side, back to him and asked him if he would please get out and show me where that the license plate had been mounted prior to it having been knocked off.
* * *
Q. Did he get out of the vehicle then?
 A. Well, not initially, matter of fact, it took four or five times asking him if he would please step out of the vehicle and show me where the license plate had been mounted.
 Q. Okay, prior to you asking him to get out of the vehicle, when you were asking him questions about the license plate, was he responding to you?
A. He was, yes.
 Q. When you asked him to walk around to show you, though, he didn't do that?
A. No, he hesitated, like I said, several times.
Q. At some point, did he eventually get up?
 A. He finally did, after some persuasion, he finally did step out of the vehicle?
Q. Did you observe anything as he stood up?
 A. As he stepped out the vehicle, I noticed that he got up very slowly — he was hanging on to the side of the car, as he slowly stood up, he kind of reached around and let the door close and I said, I need you to step around here and show me where the license plate was mounted. And he turned and as we started walking up toward the front of the vehicle, using his right hand. And he touched the side of the car, all the way up. His hand was on the window area, as we walked. Once we got to the portion where the windshield is, obviously there is no longer an area of the car there, it drops down to the hood area, at that point, his hand, it hit air, obviously there wasn't anything there and he kind of stumbled around the front fender of the car.
 Q. Did you get to the front of the car then at some point?
 A. We moved around to the front of the car, and all the time he stayed right with the vehicle, right at the vehicle, using it for support for his leg. And I asked him to show me where the license plate was mounted, and we never did get to that. I never got a positive response from him as to the area on the front bumper where the license plate was mounted.
 Q. When you say you didn't get a positive response, was he not responding to you because he didn't hear you, in your opinion? Why wasn't he responding?
 A. He heard the questions, and he heard me ask several times where the license plate was mounted, but he just kept pointing and saying it was right down there on the bumper. I couldn't get an indication of whether it was mounted on the left side of the bumper, the center of the bumper or the right side of the bumper, and that's what I was after to try and determine, was there ever a license plate mounted on the front end of the car.
 Q. Okay, during the course of your conversations with this defendant, did you notice anything about his appearance?
A. Yes, sir. I did.
Q. What did you notice?
 A. Well, I did notice, and once again, we are trained to look for this. Particularly when I noticed the odor of alcoholic beverage coming from the vehicle. I watched his movements. I watched his speech, generally speaking there was some slurring in his speech. His mouth was very dry — cotton mouth effect. I was watching his eyes, watching his movements. Movements become very deliberate when people are under the influence of alcohol and/or drugs of abuse. So they make mistakes, like stumble, or drop things. I mentioned he was going through his wallet very slowly. Fine motor skills, things that you do that are very fine like pull a driver's license out of a wallet and look for pieces of paper, things like that, are greatly diminished when you're under the influence of alcohol, and that was another thing that I noticed while he was sitting there, not acknowledging me. Just very slowly, moving things and putting them down and then putting them back in very carefully. It's just a little unusual. Watching his movements once he had gotten out of the vehicle. The way he was walking. Using the car for support. Indicated to me that he was, in fact, using it for support. And was unsure of his balance, for instance. I watched all those things and did notice an odor of an alcoholic beverage coming from his mouth as well while we talked.
* * *
 Q. Okay, what was the first test that you asked him to perform?
 A. I asked him to perform what is called HGN, horizontal gaze nystagmus test, which is a test of the eyes.
At this point, Bell explained the horizontal gaze nystagmus test, in some detail, to the jury. Continuing, Officer Bell testified as follows:
 Q. Okay, in this case, when you were about to perform that test, did you explain to the defendant what you were going to do, or did you just try to administer the test?
 A. I explained to the defendant what I was attempting to do.
 Q. Okay, tell us what happened when you tried to do that?
 A. Well, he did put his feet together and place his hands down to his side, and then when I took the pen out of my pocket and held it out, I asked him to watch the tip of the pen as I moved it. And not to move his head. And I began to move the pen back and forth as I showed him. Well, he didn't move his head, and he didn't move his eyes, he just stared right straight ahead. I thought maybe he didn't understand my instructions. So I again asked him, I need you to follow the tip of the pen with your eyes. Just watch that tip as I move them from side to side. And he stood there again and I moved the pen and he just stared right straight ahead. At that point I said, I take it that you're not going to do this test for me. And he didn't give me an answer at that point and [sic] time.
Q. Okay, he didn't say yes or no?
A. No.
Q. Did he try to explain why he wouldn't do it?
A. No, sir.
Q. What did you do at that point?
 A. Well, I wanted to give him then, another test. What we call divided attention skills test. In other words, again, typically people that are under the influence of alcohol and/or drugs have a very difficult time doing two things at once. Typically, our task is, and this is the test that I would perform, what we call one leg stand. And we simply have the individual stand and hold his foot up in front of him about six inches off the ground. One leg. Stand on one leg. And at the same time recite the alphabet. That's doing two things at once. That's very difficult for individuals who are under the influence of alcohol to do and quite typically, either they are losing their balance and having to put their foot down, or they can't say the alphabet correctly, miss letters, forget letters, don't even finish the alphabet. It's very difficult to do two things at once when you're under the influence.
 Q. Okay, so you asked the defendant to perform another test. Did you specify what that test was going to be?
 A. Yes, I told him and I showed him exactly what I wanted him to do.
 Q. Okay, and what did he say in response to your request?
 A. He said that he wasn't going to do any tests, or anything that I asked him to do.
At that point, having formed an opinion that Courtney was under the influence, Bell arrested him, and took him to the Highway Patrol Post. After Courtney was advised of his right to refuse to take a breath alcohol test, and the consequences of his refusal, he declined to take the test. Courtney was arrested and charged with DUI.
Following a jury trial, Courtney was convicted, and sentenced accordingly. Thereafter, he filed a motion for a new trial, claiming that his conviction was against the manifest weight of the evidence, and that it was not supported by the evidence. The trial court overruled his motion. Courtney appeals from the overruling of his motion for a new trial.
 II
Courtney's First Assignment of Error is as follows:
 THE TRIAL COURT ERRED BY OVERRULING THE DEFENDANT'S MOTION FOR NEW TRIAL ON THE GROUNDS THAT THE VERDICT WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE AND THAT THE VERDICT WAS NOT SUSTAINED BY EVIDENCE AS REQUIRED BY CRIMINAL RULE 33(A)(4).
Although Courtney appeals from the overruling of his motion for a new trial, this assignment of error essentially tests the weight and sufficiency of the evidence against him.
The evidence against Courtney consisted of Bell's observations of Courtney's behavior upon being stopped, the odor of alcohol, Courtney's unsteadiness on his feet, his refusal to perform two field sobriety tests, and, ultimately, his refusal to submit to a blood alcohol test. Courtney presented evidence to explain away these various facts. We agree with the State that although Courtney offered an explanation for each incriminating fact, he ultimately had too much to explain. See State v. Campbell (August 9, 1995), Clark App. No. 94-CA-78, unreported, at 7. In our view, a reasonable jury, weighing Courtney's proffered explanations against the incriminating factual circumstances, could conclude, beyond reasonable doubt, that he was under the influence of alcohol when he was stopped. It is undisputed that he was driving the car when he was stopped.
Courtney's First Assignment of Error is overruled.
 III
Courtney's Second Assignment of Error is as follows:
 THE PROSECUTOR MADE A COMMENT IN HIS FINAL ARGUMENT WHICH WAS IMPROPER AND PREJUDICIAL TO THE DEFENDANT. THE COURT MADE NO RULING ON SUCH COMMENT UPON OBJECTION BY COUNSEL FOR THE DEFENDANT.
This appeal is taken from the overruling of Courtney's motion for a new trial. In his motion for a new trial, Courtney did not raise alleged prosecutorial misconduct. Accordingly, that conduct is not properly within the scope of this appeal.
However, we have reviewed the comment, and we do not conclude that it was prejudicial.
In Courtney's closing argument, his counsel made the following comment:
 Had it not been for the fact of the license plate on the front of the vehicle, the Trooper would never have called its attention to Mr. Courtney's car. He never noticed one bit of driving that was unusual. And I would think if a person was under the influence of alcohol, something about the driving would ordinarily call your attention to the driving. The Trooper has testified nothing drew his attention to the driving. Ladies and gentlemen, I think that is an important factor, too.
In his closing argument, the Prosecutor responded to this comment as follows:
 The reason that Mr. Reynard stated you should find the Defendant Not Guilty is the same reason you should find him Guilty. Sergeant Bell just point blankly said, I didn't see any bad driving. That's absolutely true. But part of the reason he probably didn't see any bad driving is, he didn't catch up to the Defendant until he was at the stop sign at Springfield Xenia Road and 68. Then he called it in, by the time he got a call that this was the correct vehicle, he made the stop. So he really didn't have the opportunity to see any bad driving. But Sergeant Bell came in here and said, I didn't see any bad driving. There's not a more honest person that I could think of that would come out and say something like that. So for the same reason that the Defendant says, find me Not Guilty, I would ask you to find him Guilty. Thank you.
(Emphasis added.)
At this point, Courtney objected to the prosecutor's comment concerning the honesty of Sergeant Bell. It appears that this objection was made out of the hearing of the jury. There was no specific ruling on the objection, but the jury was later given the standard instruction that the evidence that it was to consider did not include the opening and closing arguments of counsel.
In context, we construe the prosecutor's comment to have amounted to nothing more than an argument that Sergeant Bell's testimony was the more credible because he acknowledged that he saw no evidence of bad driving. Obviously, had Sergeant Bell wished to embellish the State's case, he could have testified that he saw Courtney driving poorly. It is not unusual to comment that a witness's testimony should be credited because the witness has acknowledged facts that are favorable to the other side of the case.
In our view, the prosecutor's comment, in context, was not improper. In any event, it is beyond the proper scope of this appeal, which is from an order overruling a motion for a new trial that did not address prosecutorial misconduct.
Courtney's Second Assignment of Error is overruled.
 III
Both of Courtney's assignments of error having been overruled, the judgment of the trial court isAffirmed.
GRADY, P.J., and BROGAN J., concur.
Copies mailed to:
Michael F. Sheils Jack P. Reynard, Jr. Hon. Eugene S. Nevius